UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

v.

STATE OF WASHINGTON, et al.,

Defendants.

CASE NO. CV 9213
Subproceeding No. 05-3

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

This subproceeding was initiated as a Request for Determination ("Request") filed by the Upper Skagit Indian Tribe ("Upper Skagit"), asking the Court to determine that certain areas known as Saratoga Passage and Skagit Bay, on the eastern side of Whidbey Island, are not within the usual and accustomed fishing area ("U & A") of the Suquamish Indian Tribe ("Suquamish") as it was defined in *U.S. v. Washington*, 459 F. Supp. 1020 (1978). A Cross-Request for Determination was filed, with leave of Court, by the Swinomish Indian Tribal Community ("Swinomish"), essentially joining in the Request of the Upper Skagit.[1] The Suquamish filed an Answer opposing both Requests. The matter is now before the Court for consideration of summary judgment motions filed by the three parties. Oral

---

[1]The Upper Skagit originally defined the case area as Saratoga Passage, from the Greenbank Line north to the Snatelum Point Line, and Skagit Bay. The Swinomish cross-request defines the case area for their purposes as Catch Reporting Area 24C. The case area, then, encompasses that portion of Saratoga Passage within Catch Reporting Area 24C, plus Skagit Bay (Catch Reporting Area 24A). For convenience, this case area will simply be referred to interchangeably as Saratoga Passage and Skagit Bay, or as the "subproceeding area."

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 1

argument was heard on December 12, 2006, and the arguments and memoranda of the parties, and other Tribes who appeared as interested parties, have been fully considered.   As the three motions argue the same points and issues, they shall be discussed together.

## BACKGROUND

In 1975, in the language that lies at the heart of this dispute, U.S. District Court Judge George Boldt described the U & A of the Suquamish as

> the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.

Finding of Fact # 5 ("FF 5"),  *U.S. v. Washington,* 459 F. Supp. 1020, 1049 (1978).   The Upper Skagit and Swinomish assert in their separate Requests for Determination that this language is ambiguous as to certain waters lying on the eastern side of Whidbey Island, known as Saratoga Passage and Skagit Bay. They ask for a determination that the Suquamish U & A does not include these areas.  The Suquamish, in answering the Request, contend that this language is not ambiguous, and that it unambiguously includes the contested areas.

The Court has ruled previously that there is sufficient ambiguity surrounding Judge Boldt's use of the term "Puget Sound" in describing the Suquamish U & A to require clarification, thus allowing this subproceeeding to go forward.  Dkt. # 43, pp 2-3; Dkt. # 71, n. 2.   In a later Order, the Court set out a two-step procedure for reaching an understanding of Judge Boldt's intent.  Referring to prior decisions of the Ninth Circuit Court of Appeals known as *Muckleshoot I* (*Muckleshoot Indian Tribe, et al,  v. Lummi Indian Tribe*, 141 F. 3d 1355 (9th Cir. 1998)), *Muckleshoot II* (*Muckleshoot Indian Tribe v. Lummi Indian Nation*, 234 F. 3d 1099 (9th Cir. 2000)), and *Muckleshoot III* (*Puyallup Indian Tribe, et al., v. Muckleshoot Indian Tribe*, 235 F. 3d 429 (9th Cir. 2000)), the Court stated,

> These rulings inform this Court's decision on the motion to compel, as they define the scope of discovery in this matter.   The burden in this subproceeding is on the requesting parties—the Upper Skagit and the Swinomish Tribal Community— to offer evidence that FF 5 is ambiguous, or that Judge Boldt "intended something other than its apparent meaning."  *Id.* [citing to *Muckleshoot I*, 141 F. 3d at 1359.] Since the apparent meaning of the phrase "the marine waters of Puget Sound from

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 2

the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits. . . ." is in dispute here, it must be determined by the Court. **The relevant evidence on this issue is evidence which indicates the contemporary understanding of the extent of "the marine waters of Puget Sound. . . ", which will "shed light on the understanding that Judge Boldt had of the geography at the time."** *Muckleshoot I*, 141 F. 3d at 1360; *Muckleshoot II*, 234 F. 3d at 1100. This may be provided by supplementation of the record, at the appropriate time, with declarations of geography experts. *Id.* Such evidence may be offered by the parties to "enable the district court to interpret the decree in specific geographic terms." *Muckleshoot I,* 141 F. 3d at 1360.

Should the evidence show that the common understanding of the term "Puget Sound" in 1974 included Saratoga Passage and Skagit Bay, the Upper Skagit or Swinomish Tribe must produce evidence that suggests that Judge Boldt intended something other than this apparent meaning when he wrote FF 5. *Muckleshoot I*, 141 F. 3d at 1359. **The evidence that is relevant to Judge Boldt's intent comprises "the entire record before the issuing court and the findings of fact [which] may be referenced in determining what was decided."** *Muckleshoot I*, 141 F. 3d at 1359.

Dkt. # 71 (emphasis added).

## ANALYSIS

A.  Ambiguity and Apparent Meaning

The first step, as set forth above, is to determine whether Judge Boldt's language is actually ambiguous. The Skagit and Swinomish assert that it is; the Suquamish contend that it is not. The Skagit and Swinomish counter that Suquamish should be estopped from asserting unambiguity, because they have in the past, in other subproceedings, argued that the term **is** ambiguous.

As the Court has stated previously, it is not the meaning of "Puget Sound" that is at issue here, but rather its use by Judge Boldt in describing that portion of Puget Sound that constitutes the Suquamish U & A. That is, the term must be viewed in context: "the marine waters of Puget Sound from the tip of Vashon Island to the mouth of the Fraser River."

Black's Dictionary defines "ambiguity" as:

Doubtfulness; doubleness of meaning. Duplicity, indistinctness, or uncertainty of meaning of an expression used in a written instrument. Want of clearness or definiteness; difficult to comprehend or distinguish; of doubtful import.

. . . .

Ambiguity of language is to be distinguished from unintelligibility and inaccuracy, for words cannot be said to be ambiguous unless their signification seems doubtful and uncertain to persons of competent skill and knowledge to understand them. . . . .

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 3

It is *latent* where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings, as where a description apparently plain and unambiguous is shown to fit different pieces of property.  A *patent* ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used.

*Black's Law Dictionary*, 5th ed., abridged, p. 41.

The Upper Skagit and Swinomish assert that the Court has already determined that Judge Boldt's language in describing the Suquamish U & A is ambiguous, and that such determination is the law of the case.  However, the Court's previous ruling was not that the language was ambiguous, but rather that there was sufficient ambiguity "surrounding" Judge Boldt's language to justify clarification.  While a latent ambiguity may have arisen later from various judges' and parties' imprecise use or differing understanding of the term "Puget Sound", it is the possible ambiguity in Judge Boldt's use of the term in 1975 that is at issue here.

In support of their contention that the language is not ambiguous, the Suquamish point to various places in the record where "Puget Sound" was actually defined by the Court.  Specifically, Judge Boldt expressly adopted the definition of Puget Sound set forth in the "Joint Statement Regarding the Biology, Status, Management, and Harvest of the Salmon and Steelhead Resources of the Puget Sound and Olympic Peninsula Drainage Area of Western Washington", Exhibit JX-2a from the original *U.S. v. Washington* proceedings.   That definition states:   "As used in this report (except where the context clearly indicates otherwise) the term 'Puget Sound' includes the Strait of Juan de Fuca and **all saltwater areas inland therefrom**, . . . "  Ex. JX-2a, p. i.  (emphasis added).  Judge Boldt expressly adopted this definition in his Findings of Fact in *Washington I*.   Referring to the facts set forth in the report, he stated, "The contents of said report are hereby incorporated by reference as Findings of Fact herein." *Washington I*, 384 F. Supp. 312, 338 (W.D. Wash. 1974).  This became Finding of Fact 164.  *Id*.   The contents of the report necessarily include the definitions.

The Skagit and Swinomish attempt to minimize the significance of this report by characterizing it as simply a fisheries management tool.  However, this case arose out of fisheries management in Washington State, and tribal participation therein.  Judge Boldt's understanding and use of the term

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 4

1    "Puget Sound" would necessarily have been shaped by the fisheries reports and regulations that were

2    under discussion at that time.  It was therefore reasonable for the Court to consider and adopt the

3    terminology used in fisheries management in discussing the case area.

4           This was not Judge Boldt's only reference to Puget Sound as a broad area encompassing all the

5    saltwater areas inward from the entrance to the Strait of Juan de Fuca.  This same broad definition was

6    used on defining the case area in Conclusion of Law # 7:

7           This case is limited to the claimed treaty-secured off-reservation fishing rights of the
            Plaintiff tribes as they apply to areas of the Western District of Washington within the
8           watershed of Puget Sound and the Olympic Peninsula north of Grays Harbor, and in the
            adjacent offshore waters which are within the jurisdiction of the State of Washington.
9
10   *U.S. v. Washington*, 384 F. Supp. at 400.   This language is taken verbatim from ¶ 5 of the Final Pretrial

11   Order ("PTO"), Dkt. # 353, p. 5.  This PTO was signed by all the parties to the case at that time,

12   including the Upper Skagit, and approved by Judge Boldt

13          The parties' and the Court's common understanding of the extent of Puget Sound is indicated

14   once again later in the PTO:

15          Each of the Plaintiff tribes has usual and accustomed fishing places within the area described
            in paragraph 5 supra, including, among others, the waters of Puget Sound, Strait of Juan de
16          Fuca, off-shore marine waters, the Nisqually River, the Puyallup River and Commencement
            Bay, the White River, the Green-Duwamish River, Lake Washington, Cedar River,
17          Stillaguamish River, Sauk River, Skagit River, the Nooksack River, the waters of Hood
            Canal and the rivers flowing into said Canal, the Hoko River, the Quilayute River and its
18          tributaries, and the Hoh River.

19   Final Pretrial Order ¶7-14, Dkt. # 353, p. 122.   In designating only the Strait of Juan de Fuca and Hood

20   Canal as separate areas, this language necessarily subsumes the other bays and inlets, including the areas

21   at issue here, into Puget Sound, as the term was used in this case.[2]

22          The Court notes that the very maps used by the parties, admitted as exhibits by the Court on April

23
     _____

24          [2]The Court has ruled previously that this subproceeding will not address the western boundary of
     the Suquamish U & A, and therefore quotes these various definitions without making any finding as to
25   whether the Strait of Juan de Fuca is included within "Puget Sound" as that term was used by Judge
     Boldt in the Suquamish U & A.  However, the Ninth Circuit Court of Appeals has ruled previously, with
26   respect to the Lummi U & A, that "[i]t is clear that Judge Boldt viewed Puget Sound and the Strait of
     Juan de Fuca as two distinct regions, with the Strait lying to the west of the Sound."  *U.S. v. Lummi*
27   *Indian Tribe*, 235 F. 3d 443, 451-52 (9th Cir. 2000).

28    ORDER ON MOTIONS FOR SUMMARY
     JUDGMENT - 5

10, 1975 in the herring fisheries proceedings, also indicate a very broad region as Puget Sound.   The

maps themselves are National Oceanic and Atmospheric Administration ("NOAA") nautical maps with

separate designations for each bay and inlet.  Exhibit JX-3, JX-4.  However, written by the parties in

large letters on each map are the designations "Central and Southern Puget Sound" (Exhibit JX-3) and

"Northern Puget Sound" (Exhibit JX-4).  Thus, the map labeled by NOAA as "Strait of Georgia and

Strait of Juan de Fuca" is designated by the parties as Northern Puget Sound.  Exhibit JX-4.  Similarly,

the map labeled by NOAA as depicting "Admiralty Inlet and Puget Sound" is designated by the parties as

Central and Southern Puget Sound.   These handwritten designations on these maps are specific to this

case, and indicate that the terms used and understood by the parties and the Court in the April, 1975

proceedings were Southern, Central, and Northern Puget Sound, rather than the NOAA designation of

separate bays and inlets.  The handwritten labels on these maps are thus highly significant to an

understanding of Judge Bolt's use of the term "Puget Sound" during the 1975 proceedings.

These definitions, maps, and references support the conclusion that in 1975 the parties and the

Court had a common understanding of Puget Sound as the case area, encompassing all the saltwater

areas inward from the mouth of the Strait of Juan de Fuca.  Indeed, Judge Boldt so stated in September

1975, five months after the ruling at issue here, in addressing the coho salmon fishery:

> As used in this Order the term "Puget Sound", when referring to the waters of origin
> or the place of salmon harvest, includes all the marine waters of Washington inland
> from the mouth of the Strait of Juan de Fuca (Tatoosh Island) together with the freshwater
> streams and lakes draining into such marine waters.

Order dated September 13, 1975, Dkt. # 1381.  The Skagit and Swinomish assert that the language in

this Order may not be considered, because the Court has limited the evidence under consideration in this

subproceeding to that which was before the Court in April of 1975.   However, this cited Order is not

"evidence" within the meaning of that limiting rule, and it may therefore be considered as yet another

indication of Judge Boldt's understanding, in 1975, of the extent of Puget Sound for the purposes of this

case.  As noted, in every instance in 1975 where Judge Boldt did state a definition for Puget Sound, it is a

broad one which necessarily includes both Saratoga Passage and Skagit Bay.

Indeed, that conclusion is the only logical one, in light of Judge Boldt's description, in the very

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 6

paragraph following the Suquamish U & A description, of the U & A of the Swinomish:

> The usual and accustomed fishing places of the Swinomish Tribal Community include the Skagit River and its tributaries, the Samish River and its tributaries and the marine areas of northern Puget Sound from the Fraser River south to and including Whidbey, Camano, Fidalgo, Guemes, Samish, Cypress, and the San Juan Islands, and including Bellingham Bay and Hale Passage adjacent to Lummi Island.

Finding of Fact # 6, *U. S. v. Washington*, 459 F. Supp. at 1049.  This description, issued the same day and in the same Order as the Suquamish U & A, necessarily includes Skagit Bay and Saratoga Passage as within the "marine waters of northern Puget Sound", and within the U & A of the Swinomish.

Earlier, the Court invited the parties, pursuant to direction given in *Muckleshoot I*,  to supplement the record, if appropriate, with declarations of geography experts in order to aid the Court in interpreting the language of the Suquamish U & A in specific geographic terms. Dkt. # 71, citing *Muckleshoot I*, 141 F. 3d at 1360.  In light of the definitions in the record itself, and the maps known to be used by the Court as cited above, the Court now deems it unnecessary and inappropriate to turn to extrinsic evidence in order to fathom Judge Boldt's meaning.   This is particularly so in view of the lack of any evidence that Judge Boldt consulted a geography expert for definitions of the geographical terms he used; instead it appears that the terms were defined by the fisheries consultants.

Even if the Court were to consider the extrinsic evidence offered, and could find it relevant to Judge Boldt's understanding, it would find that the experts' opinions here are not based upon sufficient facts and data, and do not adequately reflect the application of scientific methods to the facts of this case. F.R.Evid. 702.  The Upper Skagit and Swinomish experts Richard Hart and Theresa Trebon (both of whom are historians, not geography experts) examined historical maps, journals, dictionaries, atlases, and other sources.  They both noted that the meaning of "Puget Sound" has changed over the years, from the original naming by Captain George Vancouver of the area at the southernmost end of the waterway. They both advanced the opinion that in 1975, as indicated on contemporary maps and charts, the term was generally used to describe the waters from the southern end up to (but not including) Admiralty Inlet. This opinion is clearly incompatible with Judge Boldt's own language in describing the Suquamish and Swinomish U & A's, which viewed Puget Sound as extending all the way north to the mouth of the

Fraser River.  The historians' opinions must therefore be disregarded as useless in shedding light on Judge Boldt's understanding of the extent of Puget Sound.

Moreover, it appears that neither historian consulted the official United States Geological Survey ("USGS") definition of Puget Sound, which would have been a highly reliable source to consult, and more precise than maps.[3]  The Suquamish earlier asked the Court to take judicial notice of this official USGS definition of Puget Sound:

> Bay, with numerous channels and branches, [which] extends 144 km S from the Strait of Juan de Fuca to Olympia; the N boundary is formed, at its main entrance, by a line between Point Wilson on the Olympic Peninsula and Partridge on Whidbey Island; at a second entrance, by a line between West Point on Whidbey Island, Deception Island, and Rosario Head on Fidalgo Island; at a third entrance, the S end of Swinomish Channel between Fidalgo Island and McGlinn Island.

U.S. Department of the Interior, *USGS Geographic Names Information System,* quoted at Dkt. # 6, p. 12.  This "official" USGS definition of Puget Sound includes Saratoga Passage and Skagit Bay, which lie just south of the second- and third-named entrances.  However, it appears that this definition was adopted in 1979, and no copy of the earlier version, adopted in 1961, has been presented to the Court. Therefore, the Court cites this definition here only as a basis for disregarding the experts' opinions as insufficiently grounded in facts and data.

Similarly, it appears that neither historian consulted the Washington Administrative Code, which in 1975 codified many of the tribal fishing regulations, area by area, and could have shed some meaningful light on the question.  Washington Administrative Code ("WAC") 220-47-001 *et seq*.  Indeed, the Exhibit JX-2a definition, adopted by Judge Boldt, mirrored the definition stated in these regulations:

> The term "Puget Sound" shall be construed to include all the waters of Puget Sound outside the mouth of any river or stream including the Strait of Juan de Fuca, Georgia Strait, and all bays and inlets thereof.

WAC 220-16-210 (adopted 1969).  Copies of certain regulations, namely WAC 220-47-206 through

---

[3] In viewing maps and charts presented in this subproceeding, the Court finds maps to be an imprecise indicator of the boundaries of water areas.  When bays and inlets are labeled on the map, it cannot be determined whether they are designated as parts of a greater whole (Puget Sound), or as separate areas which are not part of the whole.  A written description with set boundaries is more informative on the question of the boundaries of a body of water.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT - 8

220-47-268, defining the boundaries of various Puget Sound fishing areas, were provided to the Court by the Upper Skagit, in support of their motion.  Declaration of David Hawkins, Dkt. # 144 Exhibit C, pp. 14-19.  The definition of Puget Sound applicable to these regulations, quoted above, was not provided. However, the parties agreed with the Court at oral argument that the Court may take judicial notice of the WACs.  Here, the Court does so only for the purpose of pointing out deficiencies in the facts and resources researched by the two experts.

The Suquamish also presented the declaration of an expert, geographer Dr. Jon Kimerling.  The Skagit in their reply asked the Court to strike Dr. Kimerling's opinion because he was identified only as a rebuttal witness, not in the original designation of experts.  The Suquamish did not file a surreply to oppose the motion to strike.  The Court therefore grants the motion to strike those portions of Dr. Kimerling's report which offer direct, as opposed to rebuttal, testimony.

Based on the discussion above, the Court finds that Judge Boldt demonstrated his understanding of the extent of Puget Sound by defining it in the record, and it is not appropriate to resort to extrinsic evidence to determine his meaning.  As Judge Boldt defined Puget Sound as the case area, it includes the waters of of Saratoga Passage and Skagit Bay.

## B. Judge Boldt's Intent

The determination that Judge Boldt in 1975 defined the term "Puget Sound" broadly, to include the disputed area here, does not end the inquiry.  Under the rules developed by the Ninth Circuit, the Court must look to the actual evidence that was before Judge Boldt to determine if it "suggests that Judge Boldt intended something other than this apparent meaning when he wrote FF 5." *Muckleshoot I*, 141 F. 3d at 1359.  In this inquiry, the burden is on the Upper Skagit and the Swinomish to demonstrate that there was no evidence before Judge Boldt that the Suquamish fished on the east side of Whidbey Island, or traveled through there on their way up to the San Juans and the Fraser River area.

Both this Court and the Ninth Circuit Court of Appeals have noted on several occasions that Judge Boldt relied heavily on the reports and testimony of anthropologist Dr. Barbara Lane in determining the U & A's of various tribes.  *Muckleshoot I*, 141 F. 3d at 1359 (Dr. Lane's report was

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 9

1 cited and heavily relied upon by Judge Boldt in his decision); *Muckleshoot III*, 235 F. 3d at 437 (Judge

2 Boldt specifically noted that Dr. Lane's testimony prevails over that of expert Dr. Riley in the event of a

3 conflict).

4       Dr. Lane's report on the Suquamish is titled "Identity, Treaty Status and Fisheries of the

5 Suquamish Tribe of the Fort Madison Reservation" ("Report").  It was admitted as an exhibit on April 9,

6 1975.  Dr. Lane testified in that day's proceedings, and the transcript of her testimony appears in the

7 record at Docket # 7268 ("Transcript").  In both her report and her testimony, Dr. Lane characterized the

8 Suquamish as a people who traveled widely by canoe, ranging as far north as the mouth of the Fraser

9 River.  She also stated that  "[i]t was normal for all the Indians in western Washington to travel

10 extensively either harvesting resources or visiting in-laws, . . . visiting for social occasions such as

11 potlatches, weddings, feasts . . . or inter-community ceremonials or celebrations."  Transcript, p. 48.

12       In the section of her report devoted to fisheries, Dr. Lane stated that the Suquamish fished for fall

13 and winter salmon at the mouths of the Duwamish and Snohomish Rivers, and in the "adjacent marine

14 areas."  Report, p. 15. In the spring and summer, they traveled by canoe as far north as Fort Langley on

15 the Fraser River. *Id*.  Dr. Lane stated,

16       In my opinion, the evidence that the Suquamish travelled [sic] to the Fraser river [sic]
        in pre-treaty times documents their capability to travel widely over the marine waters
17       in what are now known as the Strait of Juan de Fuca and Haro and Rosario Straits.
        According to oral tradition, the Suquamish regularly travelled through the San Juan
18       Islands and to the Fraser river.

19       The Fort Langley journal documents that the Suquamish did travel to the Fraser river.
        It is my opinion that the Suquamish undoubtedly would have fished the marine waters
20       along the way as they travelled.  It is likely that one of the reasons for travel was to
        harvest fish.  The Suquamish travelled to Whidbey Island to fish and undoubtedly used
21       other marine areas as well.

22 Report, p. 16.  Dr. Lane also mentioned seasonal camps for smoke-curing fish on Bainbridge Island. *Id*.

23       The Report then listed the following places where the Suquamish traditionally took fish (salmon,

24 herring, steelhead, halibut, and shellfish), by trolling. spearing, nets, or traps:   Apple Cove Point, Hood

25 Canal, Dye's Inlet, Liberty Bay, the head of Sinclair Inlet, Skunk Bay, Union River and Curley Creek,

26 Blake Island, Jefferson Head, Point to Point, Rich's Passage, Orchard Point, Indianola, Ross Point,

27

28  ORDER ON MOTIONS FOR SUMMARY
   JUDGMENT - 10

Miller's Bay, Agate Passage, and the area between Chico and Erland's Point.  Report, p. 19-20.  This list was accompanied in the Report by a map indicating the above-named fishing places, described as being within Suquamish territory.   Report, p. 20. 22.   In her testimony, Dr. Lane clarified that the places marked on this map, all on the western side of Puget Sound, were sites within Suquamish territory, and did not indicate other areas where they may have traveled to fish.  Transcript, p. 57.

At the April 9, 1975 hearing, Dr. Lane was questioned at length about the travels of the Suquamish.  She affirmatively stated that they did travel through the San Juan Islands to the Fraser River.  Transcript, p. 49.   When questioned specifically about fishing in the area of the San Juan Islands, Birch Bay, and up to the Fraser River, she stated that she could not specifically cite to any documentation regarding Suquamish fishing for herring there, but that

> it's entirely likely that they fished for whatever was available as they were traveling through those waters and that they visited those waters regularly as a usual and accustomed matter in order to fish and to do other things.

Transcript, p. 52.

Upon Dr. Lane's re-cross examination, the discussion turned to a map that accompanied the Suquamish April 3, 1975 proposed fishing regulations.  A copy of this map appears as an attachment to the Declaration of James Janetta, Dkt. # 146, p. 74.  The map divides greater Puget Sound into numbered areas, clearly separated by lines drawn on the map.  Area 1 includes the San Juan Islands, south about halfway down Whidbey Island, and the Strait of Juan de Fuca.  Area 2 lies entirely above the San Juan Islands, extending to the Canadian border.  Area 3 encompasses Samish Bay and Bellingham Bay.  Area 4 includes the very south-eastern end of the Strait of Juan de Fuca, plus Admiralty Inlet, lower Puget Sound, Saratoga Passage, and Skagit Bay.  *Id*.   Referring to this map, attorney Paul Solomon for the Department of Game questioned Dr. Lane.  The following colloquy occurred:

> Q.   And looking at their map attached, here, what has been described as Area Number 2, is this the area, roughly speaking, that Mr. Stay has asked you about, the Strait of Juan de Fuca, Haro Strait, and whatnot?
>
> A.  I think he has asked me about what is labeled 1 and 2 on that map.
>
> Q.  Both areas 1 and 2.  That's what your comments pertain to?

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 11

A.  Well, I am speaking about the San Juan Island area, what is marked Number 1 there, and then 2.
. . . .

Q.  Now, your report on the Suquamish notes that they traveled from their regular area up north as far as the Fraser River, which would cover areas 1 and 2 on this.

A.  Part of the Area 1

Q.  Part of Area 1, and 2.

Transcript, pp. 56-57.

Nowhere in this discussion, or in Dr. Lane's entire testimony, was the area designated as Area 4 on the map mentioned.  Nor were Skagit Bay and Saratoga Passage ever mentioned in Dr. Lane's testimony regarding the Suquamish travels and fishing, or in her Report.  While she did testify that the Suquamish traveled up to the Fraser River, her reference to the Strait of Juan de Fuca, Haro and Rosario Strait places their route on the west side of Whidbey Island, from the Port Madison area and up through the San Juan Islands.  Her one statement in her report that the Suquamish traveled "to" Whidbey Island is insufficient to support a finding that they fished or traveled in the waters on the eastern side of Whidbey Island.

This absence of evidence regarding Squamish fishing or travel through Saratoga Passage and Skagit Bay leads the Court to conclude that the Upper Skagit and Swinomish have met their burden of demonstrating that Judge Boldt did not intend to include these areas in the Suquamish U & A.  The Suquamish must now point to some evidence in the record that demonstrates that this conclusion is incorrect.

In support of their assertion that their U & A includes waters on the east side of Whidbey Island, the Suquamish point to Dr. Lane's finding that the treaty-time Suquamish were competent mariners who traveled widely.   They assert that those travels would necessarily have included waters east of Whidbey Island.   However, as noted above, Dr. Lane testified that it was "normal" for "all the Indians in Western Washington to travel extensively. . ." Transcript, p. 48.  Thus such travel was not unique to the Suquamish,  and no conclusion with respect to the subproceeding area can be drawn from the mere statement that they traveled widely.  Dr. Lane's actual testimony, as shown above, addressed only travel

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 12

from the Suquamish territory up across the Strait of Juan de Fuca and through Haro and Rosario Straits, and the San Juan Islands.  It would be pure speculation to conclude that those travels must also have included the east side of Whidbey Island, as there is absolutely no evidence in the record that they did so.

Next, the Suquamish point to the fact that they were found to fish at the mouth of the Snohomish River, which is on the eastern side of Whidbey Island, but well south of the area at issue.  They assert that this fishing on the east side of Whidbey Island means that they could have well headed north into Saratoga Passage in their travels.  However, Suquamish fishing in this area was described by Dr. Lane as fall and winter fishing at the mouth of a river, presumably to take the abundant migrating salmon.  This fall and winter fishery was described by Dr. Lane as separate and distinct from the spring and summer travels up to the Fraser River.  Thus, this reference to fishing at the mouth of the Snohomish River in the fall and winter cannot be deemed evidence that the Suquamish also  traveled through that area on their way north to the Fraser River in the spring and summer.  There was no mention in Dr. Lane's Report of Suquamish fishing anywhere north of the Snohomish River in their fall and  winter fishery.

Finally, the Suquamish point to the close relations between their people and the Skagit and Snohomish people, who had fishing camps on Whidbey and Camano Islands.  They ask that the Court assume that the close relations between the tribes meant that the Suquamish must necessarily have camped and fished there as well.   However, any connection between the Snohomish and Skagit camps on Whidbey and Camano Islands, and the Suquamish fishing in these areas, would again be purely speculative.  There is nothing in Dr. Lane's report that places Suquamish camps in these areas, or documents Suquamish fishing there.

Judge Boldt found Dr. Lane's testimony to be authoritative and reliable in the original *U.S. v. Washington*, 384 F. Supp. at 350.  His description of the Suquamish U & A tracks nearly verbatim the language in Dr. Lane's report, that the Suquamish had the "capability to travel widely over the marine waters in what are now known as the Strait of Juan de Fuca and Haro and Rosario Straits."  Report, p. 16.  Further, she reported, they "regularly travelled [sic] through the San Juan Islands and to the Fraser River."  *Id.*   In naming these specific areas in describing the Suquamish U & A, Judge Boldt

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 13

demonstrated his intent to conform the Suquamish U & A to those areas documented by Dr. Lane.   As noted by the Ninth Circuit Court of Appeals, where Judge Boldt has cited the specific, rather than the general, evidence presented by Dr. Lane, that evidence determines the boundaries of a tribe's U & A. *U.S. v. Lummi Indian Tribe*, 235 F. 3d at 451.

For these reasons, the Court concludes that Judge Boldt did not intend to include Saratoga Passage or Skagit Bay within the U & A of the Suquamish.  Indeed, it appears from the record that this is how the Suquamish themselves interpreted their U & A.  The Suquamish understanding, in 1975,  that their U & A excluded waters on the eastern side of Whidbey Island is indicated in the fishing regulations they issued following the Court's ruling on their U & A.   These regulations appear in the record in the Declaration of David Hawkins, Dkt. # 144, Exhibit C.  These regulations set guidelines for fishing in specified marine and freshwater fishing areas.  No fishing was proposed in marine area 5, on the eastern side of Whidbey Island, which at that time included the areas at issue in this subproceeding.  *Id.*  While the Suquamish correctly argue that it would be improper to use these fishing regulations as evidence of Judge Boldt's intent, it is not improper to use them as evidence of the Suquamish Tribe's understanding of their own U & A at that time.

## CONCLUSION

The Court has reviewed the evidence that was before Judge Boldt in the April 1975 proceeding that led to the determination of the Suquamish U & A.  That evidence, including maps, fisheries reports, anthropological reports, and testimony, demonstrates that the Court and the parties had a common understanding that the term "Puget Sound" generally described a continuous body of saltwater in western Washington, including all the bays and inlets, and specifically including Skagit Bay and Saratoga Passage. On some occasions, areas such as the Strait of Juan de Fuca and Hood Canal were described separately. On other occasions, Puget Sound was treated as divided into regions, namely Southern, Central, and Northern Puget Sound.   Regardless of these differences, the term "Puget Sound" as used generally by Judge Boldt included Saratoga Passage and Skagit Bay.

However, in describing the individual tribes' usual and accustomed fishing areas, Judge Boldt was

 ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 14

necessarily indicating only a portion of that broader Puget Sound, even when, as here, he used the term "Puget Sound" without qualification.   Thus, for example, in the description of the U & A of the Muckleshoot Tribe, the Court has found that the term "saltwater of Puget Sound" refers only to that portion of Puget Sound in Elliot Bay.   *See*, *Muckleshoot III*, 235 F. 3d at 438.   Similarly, it has been judicially determined that the Lummi U & A, described in part as "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle" does not include the Strait of Juan de Fuca or Hood Canal.   *U.S. v. Lummi*, 235 F. 3d at 451-52.

Here, the Court finds that in describing the Suquamish U & A as the marine waters of Puget Sound from Vashon Island up to the Fraser River, Judge Boldt could not have intended to include Saratoga Passage or Skagit Bay.   Judge Boldt relied heavily on the report and testimony of Dr. Barbara Lane, and indeed in describing the Suquamish U & A he used terms and place names taken directly from her report on the Suquamish fishing and travels.   Dr. Lane reported and testified that the Suquamish traveled by canoe from their territory (Port Madison) up through the San Juan Islands, and Haro and Rosario Straits, as far as the Fraser River.   Nothing in her testimony or her report indicated a Suquamish presence in Saratoga Passage or Skagit Bay, neither as winter fishing grounds, nor as a route for travel up to the San Juan Islands.

The Court thus finds that there are no factual issues in dispute, and that the requesting parties are entitled to judgment as a matter of law on their claim that the Suquamish U & A does not include Saratoga Passage or Skagit Bay.   Accordingly, the motions for summary judgment by the Upper Skagit and Swinomish are GRANTED, and the Suquamish motion for summary judgment is DENIED.   As no issues remain to be determined, the trial date of February 26 is now STRICKEN.

The Clerk shall enter judgment in favor of the Upper Skagit and Swinomish, and close the file. Dated this 3rd day of January, 2007.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT - 15